## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Southern Division

| | | |
|---|---|---|
| **JOAN C. DAUGHETY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CBD 04-2114** |
| | ) | |
| **FRANCIS J. HARVEY,** | ) | |
| **SECRETARY OF THE ARMY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION
## GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Joan Daughety, filed this employment discrimination action against Defendant.[1]

Plaintiff alleges several federal causes of action and two state tort causes of action arising from

circumstances leading to her departure from employment at Fort Meade, Maryland.  Now before

this Court is Defendant's Motion to Dismiss and/or for Summary Judgment ("Defendant's

Motion") (Docket Item No. 56), Plaintiff's opposition ("Plaintiff's Opposition"), and

Defendant's reply ("Defendant's Reply").  No hearing is deemed necessary.  Local Rule 105.6

(D. Md.).  For the reasons below, the Court hereby GRANTS in part and DENIES in part

Defendant's Motion.

---

[1] Plaintiff initially sued Les Brownlee, then-Acting Secretary of the Army, Colonel
Michael Stewart, and Colonel John Ives.  However, Defendant Brownlee was automatically
substituted when Francis J. Harvey was sworn in as the 19th Secretary of the Army on
November 19, 2004.  Fed. R. Civ. P. 25(d)(1).  The Court approved the stipulated dismissal of
individual defendants Colonel Stewart and Colonel Ives.  Docket Item Nos. 24, 26.

## I.  STANDARD OF REVIEW

A court may grant summary judgment[2] "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).  A court must construe the facts alleged and reasonable inferences in favor of the nonmoving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

To prevail on a motion for summary judgment, the moving party must demonstrate that no genuine issue of fact exists and that it is entitled to judgment as a matter of law.  *Pulliam Inv. Co., Inc. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).  The moving party bears the initial burden of  "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

---

[2]  Defendant's Motion is captioned Motion to Dismiss and/or Summary Judgment.  The federal rules provide that if, on a motion to dismiss, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of under those rules. Fed. R. Civ. P. 12(b).  Both parties present matters outside the pleadings.  Defendant presents over 1800 pages of exhibits and deposition testimony.  Plaintiff cites to Defendant's exhibits and presents additional affidavits in support of her opposition to Defendant's Motion.  Discovery has closed.  As a result, the Court will treat Defendant's Motion as a summary judgment proceeding.

"Once the moving party discharges its burden . . . , the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Kitchen v. Upshaw*, 286 F.3d 179, 182 (4th Cir. 2002).  Where the nonmoving party has the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar record evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The disputed facts must be material to an issue necessary for the proper resolution of the case." *Thompson Everett, Inc. v. Nat'l. Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## II.  BACKGROUND

Plaintiff filed claims alleging: retaliation under 42 U.S.C. § 2000e, *et seq.* (Count I), retaliation under 42 U.S.C. § 1981a (Count II), wrongful termination under 42 U.S.C. § 2000e, *et seq.* (Count III), wrongful termination under 42 U.S.C. § 1981a (Count IV), failure to promote under 42 U.S.C. § 2000e, *et seq.* (Count V), failure to promote under 42 U.S.C. § 1981a (Count VI), and five other causes of action (Counts VII through XIII).  By stipulation, the Court entered an order dismissing Counts VII through XIII of Plaintiff's First Amended Complaint.  Docket Item No. 26.

Defendant contends that the undisputed facts fail to establish: (1) a retaliation claim; (2) a failure to promote claim; (3) a wrongful termination claim; and, (4) any claims under 42 U.S.C. § 1981a.  As a preliminary matter, there is no record evidence upon which a reasonable jury

could infer Defendant's actions were race-based.[3]  Thus, Plaintiff's case moves forward based on

retaliation for engaging in protected EEO activity and failure to promote based on retaliation for

engaging in EEO activity.

The facts presented are not chronological, but instead are grouped into pertinent

categories based on the legal themes presented by the case: failure to promote Plaintiff;

Plaintiff's EEO activity; and, Plaintiff's progressive discipline leading to proposed termination.

### A.    Failure to Promote Plaintiff.

### 1.    Plaintiff's Qualifications.

Plaintiff is an African-American college-graduate and former Chief of the Fort Meade

Non-appropriated Funds[4] ("NAF") Civilian Personnel Office ("CPO").  Defendant's Motion, Ex.

1 at 1.  The NAF CPO is a sub-office of the Fort Meade Civilian Personnel Advisory Center

("CPAC") providing personnel services to civilian employees of Fort Meade.  August 2002 EEO

Transcript, Defendant's Motion, Ex. 28 ("EEO Tr.") at 17-18.  As former chief, Plaintiff

---

[3] There is no admissible evidence substantiating Plaintiff's claim that the failure to promote was race-based.  Besides speculation and conclusory statements as to Sinclair's racially-biased motivation, Plaintiff presents no evidence based on her personal knowledge supporting her claim.  Similarly, Kelly's affidavit does not present statements based on personal knowledge with respect to Sinclair's motive to discriminate against Plaintiff.  These statements are insufficient.  *Evans v. Tech. Apps. & Servs. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[W]e generally consider self-serving opinions without objective corroboration not significantly probative.").

[4] Nonappropriated funds is defined by Army Regulations as "Cash and other assets received by Nonappropriated Fund Instrumentalities ('NAFIs') from sources other than monies appropriated by the Congress of the United States.  NAFIs are Government funds used for the collective benefit of those who generate them: military personnel, their family members, and authorized civilians.  These funds are separate and apart from funds that are recorded in the books of the Treasurer of the United States."  U.S. DEP'T OF ARMY, REG. 215-3, MORALE, WELFARE, AND RECREATION NONAPPROPRIATED FUNDS PERSONNEL POLICY at 114 (26 Aug. 2002) (hereinafter "ARMY REG. 215-3").

administered personnel policies and procedures for NAF employees at Fort Meade.  Defendant's

Motion, Ex. 1 at 2; EEO Tr. at 17-18.  Throughout her twenty six years of service, Plaintiff

received evaluations indicating her work was excellent until a change in supervisors occurred in

September 2001.  Deposition of Bruce Hopkins, Defendant's Motion, Ex. 35 ("Hopkins Dep.")

at 29; Plaintiff's Deposition, Defendant's Motion, Ex. 37 ("Plaintiff Dep.") at 115.

### 2.      The CPAC Supervisory Position.

The CPAC was formerly supervised by Agnes Thomas, an appropriated funds[5] ("APF")

employee.  Plaintiff Dep. at 27.  Thomas' official job title was Human Resource Officer, same as

Plaintiff's, but Thomas was Plaintiff's first line supervisor and rating official and had a different

pay grade and responsibilities.  *Id.*

Thomas accepted an early retirement buyout.  Defendant's Motion, Ex. 4 at 15.  Thomas'

retirement was effective on September 30, 2001.  *Id.* at 17, 21.  Plaintiff was not considered for

the promotion to Thomas' former position as Chief of the CPAC.

### 3.      Sinclair's Qualifications.

Janine Sinclair was an APF employee of American Indian descent who performed

Management - Employee Relations[6] at Fort Meade.  EEO Deposition of Janine Sinclair,

Defendant's Motion, Ex. 29 ("Sinclair EEO Dep.") at 124-25.  Sinclair, a high-school graduate,

completed one semester of college.  Deposition of Janine Sinclair, Defendant's Motion, Ex. 33

---

[5] Appropriated funds is defined by Army Regulations as "Monies made available to the military departments by the Congress of the United States. . . .  The purpose for which funds are appropriated are specified by Congress in its appropriation acts."  ARMY REG. 215-3 at 111.

[6] The Management - Employee Relations provides resources for managers on employee relations regarding policies, announcements, and general information including sexual harassment, explanation of awards, health promotions, and other topics.  U.S. Army Civilian Personnel On-line, http://cpol.army.mil/library/mer/ (last accessed March 20, 2006).

("Sinclair Dep.") at 8.  She had no formal supervisory experience.  Sinclair EEO Dep. at 30.

Sinclair was a relatively low-ranking personnel specialist in the CPAC.  Plaintiff Dep. at 98.

Thomas was Sinclair's first level supervisor and performance appraiser.  Sinclair EEO Dep. at

71, 72.

### 4.      Sinclair's Selection to the Supervisory Position.

After Thomas' September 2001 buyout, "there was a need for another employee to

assume her supervisory duties."  Defendant's Motion at 5.  The Installation Commander Colonel

Michael Stewart[7] noncompetitively detailed the duties previously performed by Thomas to

Sinclair.  Sinclair EEO Dep. at 101-06.  Sinclair's new detailed duties were essentially Thomas'

old job description.  *Id.* at 85.  Sinclair was selected despite having less education than Plaintiff

and no formal supervisory experience because Colonel Stewart claimed to have more trust and

confidence in her abilities.  *Id.* at 101-02, 223.  On October 1, 2001, as a result of assuming

Thomas' duties, Sinclair became Plaintiff's immediate supervisor and Chief of the CPAC.  *Id.* at

26-27, 124-25.

The detail assumed by Sinclair had promotion potential.  EEO Tr. at 34, 77.  Sinclair's

original detail was extended twice.  Defendant's Motion, Ex. 6 at 15-17.  Finally, on June 15,

2002, Sinclair was noncompetitively promoted to her current position as Supervisory Human

Resource Specialist for the CPAC at Fort Meade.  Sinclair EEO Dep. at 9.  Sinclair's supervisory

detail resulted in an increase to her rank, GS grade and pay.  Sinclair Dep. at 8.

### B.      Plaintiff's EEO Activity and Letter Contesting Sinclair's Assignment.

### 1.      Plaintiff's EEO Complaint.

---

[7] Colonel Stewart was Fort Meade's Commander of the Garrison and Installation from
July 1999 to June 2002.

The Sinclair-Plaintiff work relationship was "tense" after September 2001.  Deposition of Craig Strambler, Defendant's Motion, Ex. 36 ("Strambler Dep.") at 30.  Plaintiff believed that the detailing of Thomas' duties and eventual promotion had to be competitively filled initially and/or after the first 120 days of Sinclair's detail.  Plaintiff Dep. at 93.  On January 28, 2002, Plaintiff filed an EEO complaint regarding the process by which the Chief of CPAC position was filled and other ancillary work-related issues.[8]  October 2002 EEO Hearing Opinion, Defendant's Motion, Ex. 27 ("EEO Hr'g Op.") at 102.  Plaintiff challenged the action because: (1) Sinclair had no formal supervisory experience; (2) Plaintiff was qualified and eligible for the detail; (3) Colonel Stewart had no performance-related reason not to consider Plaintiff for the position; and, (4) the eventual GS-13 position should have been filled competitively.  EEO Tr. at 27, 34, 77, 223; Deposition of Colonel Michael Stewart, Defendant's Motion, Ex. 31 ("Col. Stewart Dep.") at 22; Plaintiff Dep. at 83-101, 103-05.

## 2.    Plaintiff's Request for Assignment to the Detail.

In April 2002, Plaintiff asked Bruce Hopkins, the Deputy Installation Commander and Plaintiff's second-line supervisor, to be considered for the detail assigned to Sinclair.  Plaintiff noted that her formal education, professional experience and training in both NAF and APF activities met the requirements to be the CPAC supervisor.  Defendant's Motion, Ex. 5 at 1; Plaintiff Dep. at 100-01.  At that time, the Department of the Army was considering transitioning

---

[8] Plaintiff's complaint alleged nine claims of discrimination concerning: (1) her non-selection for the CPAC supervisory position; (2) being denied the right to advise Colonel Stewart; (3) being forced to relocate to smaller inadequate work space; (4) being threatened with being detailed to the library; (5) being refused an employment evaluation for accomplishments during 2001; (6) being issued a May 15, 2002 Letter of Warning; (7) being told her job was going to be eliminated; (8) being unusually excluded from an employment action by Sinclair's explicit direction; and, (9) being not invited to a meeting concerning a NAF employee's removal. EEO Hr'g Op. at 6-9.

to an all NAF work force and the CPAC was reducing its APF operations.  *Id.*  On May 13, 2002, Hopkins responded to Plaintiff that Sinclair held the supervisory position but, "should the position open in the future," Plaintiff should apply.  Defendant's Motion, Ex. 5 at 2.

### 3.    Plaintiff's Other EEO Activity.

In October 2001, Plaintiff was listed as a potential witness for Reba Miller-Willoughby, a former Army employee at Fort Meade, in her Merits Systems Protection Board appeal against the Army alleging discrimination.  EEO Hr'g Op. at 21.

In April 2002, Plaintiff was approved as a witness for the Miller-Willoughby appeal. Plaintiff's Opposition, Ex. 1 at 4.  Both Sinclair and Colonel Stewart were approved as witnesses for the agency and were aware that Plaintiff was testifying as an adverse witness.  Sinclair Dep. at 40-41.

### 4.    The EEO Hearing Concerning Plaintiff's EEO Complaint.

On August 13, 2002, EEO Investigator Marty Bloom held a hearing at Fort Meade regarding Plaintiff's claims.  Colonel Stewart testified that he did not detail Plaintiff to the position because: (1) he knew of a May 2002 report indicating irregularities in NAF conversions; (2) Weldon Kelley, Director of Personnel and Community Activities, had advised him that, as the main customer of Plaintiff's office, he felt that he was not being properly supported; (3) NAF employees could not supervise APF employees; and, (4) he lacked trust and confidence in her abilities.  EEO Tr. at 103, 105.

Colonel Stewart testified that he gained confidence in Sinclair based on her help in resolving a situation with a senior member of his staff, and Sinclair's professional and unbiased advice as one of his many "sounding boards."  *Id.* at 105.  While Colonel Stewart initially

considered Plaintiff to be detailed to Thomas' previous duties, she fell out of consideration when he was advised that "NAF personnel could not supervise [APF] people."  *Id.* at 108; *See also* Col. Stewart Dep. at 20.

Ingrid Linberg, interim Director of Community Services, testified at the hearing, that Colonel Stewart demonstrated favoritism towards Sinclair while at Fort Meade.  EEO Tr. at 250. However, Linberg could not say Colonel Stewart's favoritism was based on race or color.  *Id.* at 251.

Craig Strambler, Employee Relations Specialist and Plaintiff's subordinate in the NAF office, testified that Sinclair wanted him to meet with Linberg about the removal of a NAF employee.  EEO Tr. at 262-65.  Strambler was instructed not to tell Plaintiff of his involvement in the action.  *Id.* at 262.  While Plaintiff's exclusion from a meeting of this kind was highly unusual, Strambler could not definitively say it was motivated by Plaintiff's race or prior EEO activity.  *Id.* at 269.  Strambler also could not say Sinclair's contentious relationship with Plaintiff was based on Plaintiff's race or prior EEO activity.  *Id.*

### 5.    The EEO Hearing Results.

On October 7, 2002, EEO Investigator Bloom rendered a decision resolving Plaintiff's complaints regarding the CPAC supervisory position.  EEO Hr'g Op.  Bloom found: (1) Colonel Stewart lacked trust in Plaintiff; (2) Thomas' position was abolished; (3) Sinclair was initially detailed, not promoted; (4) both Plaintiff and Sinclair were "seasoned personnelists"; and, (5) education was not a qualification of the position.  EEO Hr'g Op. at 20.  Bloom concluded that the evidence tended to support the reasons for management's decisions for selecting Sinclair for the detail.  *Id.* at 24.

### C.    Plaintiff's Progressive Discipline Leading to Proposed Termination.

#### 1.    The Harris Report.

On May 2, 2002, Lynn Harris, Military District of Washington Civilian Personnel Directorate, completed a review of NAF personnel actions submitted by Plaintiff at the request of Colonel Stewart.  Defendant's Motion, Ex. 8 at 5.  The report found several potential violations resulting in five individuals receiving significant pay increases.  *Id.*  Harris repeatedly noted that the "salary increase[s] may not be inappropriate but it [was noted] to accent the need for local pay setting policy." *Id.* at 6-7.  Harris' recommendations included: (1) insuring the accuracy of classification of pay; (2) investigating the person initiating the personnel action; (3) investigating actions to determine if government funds were misappropriated; (4) recouping funds where necessary; and, (5) recommending a policy limiting pay changes and awards to 5% annually.  *Id.* at 7-8.

#### 2.    Sinclair's May 2002 Letter of Warning.

On May 15, 2002, in a Letter of Warning, Sinclair opined Plaintiff was minimally satisfactory in the performance of her duties.  Defendant's Motion, Ex. 9 at 1.  In particular, Sinclair found her "culpable" because her office processed the paperwork submitted by the Directorate of Community Activities for the five individuals referenced in Harris' report. Sinclair also found Plaintiff culpable for the actions of a subordinate, Reggie Reese, in providing allegedly erroneous information to a client.  *Id.* at 3.  Sinclair required Plaintiff to take corrective action in four of the five cases referenced in Harris' report, and further required authentication of submitted personnel actions for "regulatory correctness." *Id.* at 3-4.  Plaintiff was the only employee disciplined as a result of the Harris report.

### 3.      Sinclair's September 2002 Letter of Reprimand to Plaintiff.

On September 26, 2002, in a Letter of Reprimand, Sinclair reprimanded Plaintiff for disrespectful language stemming from an e-mail between the parties.  Defendant's Motion, Ex. 10 at 4.  Sinclair took issue with Plaintiff's question, "Is that another way for you to justify your promotion?"  *Id.* at 5.  Plaintiff later stated, "It is apparent that no one can supervise you. You were given your position without merit. . . .  It is apparent that you can not police yourself and are having difficulty supervising me."  *Id.*

### 4.      The Turpin Audit.

On December 12, 2002, Colleen Turpin, a temporary APF employee, competed an internal audit of all the NAF personnel files at Sinclair's direction.  Strambler Dep. at 15.  Turpin worked in the CPAC but not in the NAF personnel office.  *Id.*  Turpin was not an auditor. Deposition of Colleen Turpin, Defendant's Motion, Ex. 34 ("Turpin Dep.") at 12-13, 15. Turpin's review was conducted by the use of ARMY REG. 215-3 "which I read and I tried to get help with interpreting to make sure I was correct."  *Id.* at 23.  Turpin testified that Strambler was not keeping up with his job and the major problem found in the audit, the appraisals, were his responsibility.  *Id.* at 31.  Strambler was not disciplined as a result of the Turpin report. Strambler Dep. at 46.

There was only one audit of NAF files in the 1990s.  *Id.* at 11; Sinclair Dep. at 44.  That audit was conducted by United States Civilian Personnel Evaluation Agency ("USACPEA") with the auditors coming on-site.  Strambler Dep. at 12.  The audit of the NAF office was satisfactory.  *Id.*  After Turpin's audit, Plaintiff made several requests to those above her in the chain of command to have another audit conducted by the USACPEA.  Defendant's Motion, Ex.

21 at 3.  Her request to Hopkins stated "I am requesting that you ask for a professional, formal audit of my [NAF] Unit's work, and of Ms. Sinclair [APF] Unit's work by the [USACPEA]." *Id.*  Plaintiff's requests were not granted.  Hopkins Dep. at 34-37.

### 5.      Hopkins' December 2002 Notice of Decision Regarding Sinclair's Letter of Reprimand.

On December 20, 2002, Hopkins rendered a Notice of Decision regarding Sinclair's September 2002 letter of reprimand.  Defendant's Motion, Ex. 10 at 7.  Hopkins found Plaintiff's comments to Sinclair to be disrespectful.  *Id.*  Hopkins counseled Plaintiff, "[a]s a supervisor of three employees and the personnel advisor to over 400 employees you must set the example for a productive work relationship with your supervisor."  *Id.*  Furthermore, Hopkins warned that any recurrence could result in more severe discipline including proposing Plaintiff's removal from the federal service.  *Id.*

### 6.      Sinclair's March 2003 Warning of Unsatisfactory Performance to Plaintiff.

On March 5, 2003, Sinclair issued another written warning to Plaintiff.  Defendant's Motion, Ex. 16 at 1.  Sinclair addressed several performance deficiencies, rehashing Reese's allegedly erroneous advice prior to May 2002, and the errors uncovered by the Turpin audit.  *Id.* at 2.  The letter warned that Plaintiff could be subject to discipline, including termination, if she did not improve her performance.  *Id.* at 4.  Plaintiff was the only employee to receive a negative evaluation, remand, and/or disciplinary consequence as a result of the Turpin audit.  Strambler Dep. at 46.

### 7.      Sinclair's July 2003 Notice of Proposed Separation to Plaintiff.

On July 2, 2003, Sinclair issued Plaintiff a Notice of Proposed Separation. Defendant's Motion, Ex. 20 at 1. The notice referenced the March 5, 2003 warning of unsatisfactory performance, and indicated that Plaintiff's performance had not improved. *Id.* The notice cited numerous performance problems including Reese's allegedly erroneous advice prior to May 2002, the Turpin audit errors, and Plaintiff's failure to acknowledge responsibility for and/or to some extent correct the audit errors. *Id.* at 1-8.

### 8. Hopkins' August 2003 Notice of Proposed Separation to Plaintiff.

On August 25, 2003, Hopkins informed Plaintiff that he had decided to terminate her employment. Defendant's Motion, Ex. 22 at 1. Hopkins concluded that the reasons stated in the July 2003 Notice of Proposed Separation were fully supported by a preponderance of the evidence and justified Plaintiff's removal. *Id.* Plaintiff's termination was scheduled to take effect on September 3, 2003.

### 9. Plaintiff's Election to Retire Before Being Terminated.

Rather than permit her termination to take effect, Plaintiff retired from federal service, effective August 25, 2003. Plaintiff's Opposition, Ex. 1 at ¶ 9.

## III.  DISCUSSION

Generally, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, forbids employment discrimination based on race, color, religion, sex, or national origin. The ultimate burden of proof rests with Plaintiff to prove that she was terminated as a result of an illegal discriminatory reason. A plaintiff presenting only circumstantial evidence of illegal discrimination may avert summary judgment under the three-step burden shifting "pretext"

method established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  As the

Court of Appeals for the Fourth Circuit recently reiterated:

> Under the *McDonnell Douglas* three-step framework, "the plaintiff-employee
> must first prove a *prima facie* case of discrimination by a preponderance of the
> evidence.  If she succeeds, the defendant-employer has an opportunity to present a
> legitimate, non-discriminatory reason for its employment action.  If the employer
> does so, the presumption of unlawful discrimination created by the *prima facie*
> case drops out of the picture and the burden shifts back to the employee to show
> that the given reason was just a pretext for discrimination.

*Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004).  Plaintiff's three Title VII claims –

retaliation, failure to promote and wrongful termination – are subject to the *McDonnell Douglas*

analysis.  Finding that Plaintiff's retaliation and failure to promote claims are inextricably

intertwined, the Court will discuss both claims together.

### A.       Plaintiff Presents a Retaliation Claim Under Title VII.

To establish a *prima facie* Title VII retaliation claim, Plaintiff must produce evidence

from which a reasonable jury could find: (1) that she engaged in a protected activity; (2) that her

employer took an adverse employment action against her; and, (3) that a causal connection

existed between the protected activity and the asserted adverse action.  *Mackey*, 360 F.3d at 469.

### 1.       Plaintiff's *prima facie* Case.

### a.       Protected Activity.

Retaliation requires protected activity.  Title VII protects the right of employees to

oppose any unlawful employment practice. Section 704(a) of Title VII of the Civil Rights Act of

1964 (42 U.S.C. § 2000e-3(a)) contains a "participation clause" making it an unlawful

employment practice for an employer to discriminate against an employee who has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under Title VII.  Employees are guaranteed the right to complain to their superiors about

suspected violations of Title VII.  *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 650

(4th Cir. 2002).  Plaintiff has engaged in protected activity, specifically being identified as a

witness on behalf of employee Miller-Willoughby in October 2001, and in filing her own EEO

complaint in January 2002.

**b.**      **Adverse Employment Action: Failure to Promote.**

Retaliation requires an adverse employment action.  Adverse employment actions include

any retaliatory act or harassment if that act or harassment results in an adverse effect on the

terms, conditions, or benefits of employment.  *Von Gunten v. Maryland*, 243 F.3d 858, 865-68

(4th Cir. 2001).  Plaintiff argues that she was the victim of retaliation when she was excluded

from meetings, her evaluations were delayed, and her work was subjected to heightened scrutiny.

Defendant argues that these claims do not constitute an actionable adverse employment action,

because the claims do not detrimentally effect the terms, conditions, or benefits of employment

in a material way.

The Fourth Circuit has repeatedly held that the significant protections of Title VII do not

extend to every possible action taken in the workplace.  *Page v. Bolger*, 645 F.2d 227, 233 (4th

Cir. 1981) ("[I]t is obvious that there are many interlocutory or mediate decisions having no

immediate effect  upon employment conditions which were not intended to fall within the

proscriptions of . . . Title VII.").  Courts have held that close monitoring and disciplinary

investigations do not constitute adverse employment actions.  *Settle v. Baltimore County*, 34 F.

Supp.2d 969, 1009-10 (D. Md. 1999); *Chika v. Planning Research Corp.*, 179 F. Supp.2d 575,

587 (D. Md. 2002) (greater scrutiny of the office is not adverse employment action).  The Court

also notes "favoritism towards one individual does not constitute discrimination actionable under Title VII." *Holder v. City of Raleigh*, 867 F.2d 823 (4th Cir. 1989).

A different view has surfaced on this issue in the Fourth Circuit's unpublished opinion in *Nye v. Roberts*, 145 Fed. Appx. 1 (4th Cir. 2005). The Court held that in a system of progressive discipline, letters of reprimand and negative evaluations can constitute adverse employment actions for the purposes of a retaliation claim. The Court reasoned that a reasonable jury could find that formal letters of reprimand and downgraded performance evaluations "thrust [an employee] further along the discipline track and closer to termination," thus precluding a grant of summary judgment. *Id.* at 6. After *Nye*, whether the letter of reprimand, downgraded performance evaluations and Plaintiff's progressive discipline were adverse employment actions are questions for the jury.

The September 2001 non-selection of Plaintiff for the detail and/or the June 2002 failure to promote Plaintiff are quintessential adverse employment actions. Non-selection for the detail of Thomas' duties materially affected Plaintiff's "terms conditions, or benefits of employment" as this detail became the reason Sinclair was eventually promoted to GS-13. The Court finds the non-selection in 2001 and Sinclair's promotion in 2002 are part of the one adverse employment action: failing to promote Plaintiff.

Failure to promote an employee constitutes an adverse employment action requiring Plaintiff to show that: (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and, (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Bryant v. Aiken Reg'l Med. Ctr. Inc.*, 333 F.3d 536, 544-45 (4th Cir. 2003). There is no dispute that Plaintiff was

16

a member of a protected group and, despite Defendant's protest, she was qualified for the position.  Plaintiff argues that there was no opportunity to apply since Ms. Sinclair was selected for both the detail and promotion non-competitively.  Defendant argues it is fatal to Plaintiff's case that Plaintiff did not apply for the position in question.  The Court does not agree.

Requiring the employee to apply for a job where the employer did not post a vacancy is unrealistic.  *Williams v. Giant Food, Inc.*, 370 F.3d 423, 425 (4th Cir. 2004).  Plaintiff made known her desire for the position by her April 2002 letter asking Hopkins to consider her for the detail assigned to Sinclair.  This action occurred prior to Sinclair's permanent promotion.  Hopkins indicated the position was filled by Sinclair but, "should the position open in the future," Plaintiff was encouraged to apply.  Defendant's Motion, Ex. 5 at 2.

The fourth prong requires being rejected for the position under circumstances giving rise to an inference of unlawful discrimination.  That requirement is met because Plaintiff engaged in protected EEO activity, the record of progressive discipline leading to termination began and Plaintiff was not promoted.

### c.      Causal Connection.

Retaliation requires a causal connection between the protected activity and the adverse employment action.  "Very little evidence of a causal connection is required to establish a *prima facie* case."  *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir. 1998).  In fact, the mere closeness in time between the filing of a discrimination charge and the adverse action is sufficient to "make a *prima facie* case of causality."  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).  An employer's knowledge of an employee's protected activity is essential to establishing a causal connection between that activity and any adverse employment

17

action.  *Causey v. Balog*, 162 F.3d 795, 803-04 (4th Cir. 1998).  Colonel Stewart and Sinclair

testified to knowledge of Plaintiff's protected activity because they were present at the Miller-

Willoughby hearing and were served as parties to Plaintiff's EEO complaint.  Defendant's

failure to promote Plaintiff occurred in close proximity to Plaintiff's EEO activity.  A reasonable

jury could infer that the latter engendered the former.  As a result, Plaintiff has established a

*prima facie* case of retaliation.

### 2.       Defendant's Legitimate Nondiscriminatory Reasons.

Since Plaintiff can establish a *prima facie* case of retaliation, the burden shifts to the

Defendant to articulate a legitimate nondiscriminatory reason for its actions.  *McDonnell*

*Douglas*, 411 U.S. at 805.  Colonel Stewart testified that he did not detail Plaintiff to Thomas'

position because: (1) he knew of Harris' May 2002 report indicating irregularities in NAF

conversions; (2) Weldon Kelley, Director of Personnel and Community Activities, had advised

him that, as the main customer of Plaintiff's office, he felt that he was not being properly

supported; (3) NAF employees could not supervise APF employees; and, (4) he lacked trust and

confidence in her abilities.  The articulation of these nondiscriminatory reasons satisfies

Defendant's burden of production.

### 3.       Plaintiff's Burden to Establish Pretext.

After the employer meets this burden of production, "the *McDonnell Douglas*

framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is]

discrimination *vel non*."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-42

(2000) (internal quotation marks omitted).  In other words, the burden shifts back to the plaintiff

to prove by a preponderance of the evidence that the employer's stated reasons "were not its true

reasons, but were a pretext for discrimination." *Id.* at 143.  At this point, the burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.  Plaintiff must now produce evidence that the nondiscriminatory reasons proffered for the adverse actions are dishonest or not the real reason for her termination. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).

### a.    The Harris Report.

Harris' report indicating irregularities did not focus on Plaintiff's involvement in the transactions.  There is testimony that the NAF conversion actions were approved in light of Colonel Stewart's signature on a Memorandum of Agreement.  The questionable transactions were undoubtedly initiated by someone superior to Plaintiff in the chain of command.  Plaintiff's Opposition, Ex. 3 at ¶3.  Harris' report noted that the conversions may not have been *inappropriate*, but were highlighted to show Colonel Stewart the need for him to set a local policy limiting annual pay increases to a fixed percentage of the person's pay.  Other testimony establishes that Plaintiff's office only processed the requests previously approved by the chain of command.  Col. Stewart Dep. at 34.  Finally, Plaintiff was the only person disciplined as a result of the report.

### b.    Weldon Kelley's Statements.

Colonel Stewart testified that Weldon Kelley impressed upon him that Plaintiff did not properly support the office of the Director of Personnel and Community Activities.  This office was Plaintiff's biggest customer.  However, Kelley attested that he was neither dissatisfied with Plaintiff's level of service to his office, nor did he ever make any such comments to Colonel

Stewart.  Plaintiff's Opposition, Ex. 4. at ¶ 3 ("I had no problems with the service provided by Ms. Daughety and her office.  I did not tell Colonel Michael Stewart or others that I did not receive the proper support from Ms. Daughety's office.").

### c.   NAF Employees Supervision of APF Employees.

Despite maintaining that ARMY REG. 215-3 is the source of the regulatory prohibition against a NAF employee supervising an APF employee, Defendant fails to provided any specific authority in support.  Hopkins' May 2002 response inviting Plaintiff to apply for the position should a vacancy arise flies the face of Colonel Stewart's testimony that Plaintiff could not be Chief of the CPAC as an NAF employee.  There is testimony that the regulations allow for the supervision of APF employees and military personnel by NAF employees from Sinclair, Strambler and Daugherty.  A finding in this regard was made after Plaintiff's August 2002 EEO hearing.  EEO Hr'g Op. at 23 (ARMY REG. "215-3 and DoD/OPM Interchange Agreement reflect that a NAF employee may be assigned as the supervisor of APF employees.").

### d.   Colonel Stewart's Lack of Trust and Confidence in Plaintiff's Abilities.

Colonel Stewart testified that he lacked trust and confidence in Plaintiff's abilities. However, Colonel Stewart also testified that there was no job-performance reason not to consider Plaintiff for Thomas' position.  Col. Stewart Dep. at 22.  Based upon Colonel Stewart's testimony, he did not have much first-hand interaction with Plaintiff.  A reasonable jury could infer that his impression of Plaintiff came from Sinclair as she worked in his building and was his sounding board.  Sinclair's motive(s) can be imputed to Colonel Stewart in an appropriate case.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286-91 (4th Cir. 2004) (may impute subordinate's bias to supervisor if subordinate is supervisor's "cat's paw").

20

### 4.      Plaintiff's Proof Can Establish Pretext.

Although the presumption of discrimination "drops out of the picture" once Defendant meets its burden of production, the trier of fact may still consider the evidence establishing Plaintiff's *prima facie* case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Burdine*, 450 U.S. at 255, n. 10.  Plaintiff adduces sufficient proof of pretext to support her retaliation claim because a reasonable jury could find by a preponderance of the evidence "that the employer's proffered explanation is unworthy of credence." *Id.* at 256.

Plaintiff's proof establishes considerable doubt as to whether Defendant's proffered nondiscriminatory reasons were in fact the reasons for failing to promote Plaintiff.  Plaintiff is able to refute three of the four proffered reasons: Harris' report; Kelley's statements; and, the notion that a NAF employee can not supervise an APF employee.  Given Plaintiff's pretext evidence, the fourth reason, Colonel Stewart's claimed lack of trust in Plaintiff, becomes a credibility issue, reserved for the jury.  Defendant's Motion is denied as to Counts I and V.

### B.      Plaintiff Fails to Present a Wrongful Discharge Claim Under Title VII.

To establish a *prima facie* case of wrongful discharge/termination Plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she was fired; and, (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133, 133 n. 7 (4th Cir. 2002).  It is undisputed that Plaintiff retired from federal service rather than allowing herself to be terminated.  Plaintiff's Opposition, Ex. 1 at 3 ("I retired a few days before the effective date of my termination so I could list retirement rather

than termination for cause on future job applications."). Where an employee resigns and is not terminated, she cannot establish wrongful termination. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) ("Honor was not terminated. A reasonable jury could not conclude that Honor established a *prima facie* case of wrongful termination."). Defendant's Motion is granted as to Count III.[9]

### C.    Plaintiff's § 1981a Claims are Preempted by Title VII.

Counts II, IV and VI of Plaintiff's Amended Complaint allege retaliation, wrongful termination, and failure to promote under the Civil Rights Act of 1991, 42 U.S.C. § 1981a. The § 1981a counts are based on the same conduct for which Plaintiff seeks relief under Title VII. Defendant argues that these counts are preempted by Title VII as it "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. Gen. Serv. Admin.*, 425 U.S. 820, 835 (1976).

Title VII claims under § 1981a allow recovery of damages for intentional discrimination against private individuals, corporations and even public officials, whether elected or appointed. *See generally*, *Beardsley v. Webb*, 30 F.3d 524 (4th Cir. 1994). However, Plaintiff is a federal employee and *Brown* requires dismissal of these counts on preemption grounds. *Pueschel v. United States*, 369 F.3d 345, 353 (4th Cir. 2004) (reaffirming *Brown*'s holding that Congress intended for Title VII to be exclusive, preemptive administrative and judicial scheme for the redress of federal employment discrimination). As a result, Counts II, IV, and VI are dismissed.

### IV. CONCLUSION

---

[9] Plaintiff conceded that she neither alleged nor sought to prove a constructive discharge claim. Plaintiff's Opposition at 13. Thus, relevant evidence tending to establish Plaintiff's constructive discharge becomes irrelevant.

For the forgoing reasons, Defendant's Motion Summary Judgment is GRANTED in part, and DENIED in part.  Defendant's Motion is DENIED as to Counts I and V and GRANTED as to Counts II, III, IV and VI.  Counts II, III, IV and VI are dismissed.

_____/s/_____
Charles B. Day
United States Magistrate Judge
March 20, 2006

CBD:jab